IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUST BORN, INC., <br><br> Plaintiff, <br><br> v. <br><br> LOCAL UNION NO. 6, BCTGM, <br><br> Defendant. | CIVIL ACTION <br> NO. 16-5114 |

**MEMORANDUM OPINION**

**Schmehl, J.  /s/ JLS**　　　　　　　　　　　　　　　　**December 29, 2017**

**I.　　INTRODUCTION**

　　Plaintiff, Just Born, Inc. ("Plaintiff" or "Just Born"), brings this suit against Defendant, Local Union No. 6, Bakery, Confectionery, Tobacco Workers and Grain Millers International Union of America ("Defendant" or "Union") for damages and declaratory relief under Section 301 of the Labor Management Relations Act for the Union's alleged breach of its collective bargaining agreement ("CBA") entered into with Plaintiff. Before the Court is the Motion for Summary Judgment of Defendant and Plaintiff's Cross-Motion for Partial Summary Judgment, as well as numerous responses and replies to each. For the following reasons, Defendant's Motion is granted, Plaintiff's Cross-Motion is denied, and judgment will be entered in favor of the Union.

**II.　　LEGAL STANDARD**

　　Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. Proc. 56(c).  "A motion for summary judgment will not be defeated by 'the mere existence' of

some disputed facts, but will be denied when there is a genuine issue of material fact." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (*citing Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

### III.  FACTUAL BACKGROUND

Plaintiff is a candy manufacturer that owns and operates a production facility in Bethlehem, Pennsylvania. (Stmt of Undisputed Mat'l Facts, ¶ 1.) Production and maintenance workers at the Bethlehem Just Born facility are represented by Defendant, Local No. 6 of the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union. (Id., ¶ 2.) Production and maintenance workers at the Bethlehem facility have been represented by local unions affiliated with the international union currently known as the Bakery, Confectionery, Tobacco Workers and Grain Millers

International Union since at least 1954. (Id., ¶ 2.) Just Born and Local 6 have negotiated collective bargaining agreements setting wages, hours, and other terms and conditions of employment for the union-represented production and maintenance workers and the Bethlehem facility. (Id., ¶ 3.) The collective bargaining agreement ("CBA") at issue in this case contained the following relevant language in Article 19, titled "SETTLEMENT OF GRIEVANCE AND ARBITRATION:"

> 19.1 Should any difference arise between the Company and the Union as to the meaning and application of the provisions of this Agreement or as to any questions relating to the wages, hours of work and other conditions of employment of any employee, there will be no suspension of work on account of such differences, but an earnest effort will be made to settle them promptly according to the following procedure.

(See Exh. 1 to Stmt of Mat'l Facts.)

Article 24 of the CBA, titled "PROHIBITIONS OF STRIKES AND LOCK-OUTS," states:

> The Union will not cause or permit its members to cause, nor will any member of the Union take part in, any strike, either sit-down, stay-in or any other kind of strike, or other interference, or any stoppage, total or partial, of production in the Company's plant until the grievance procedure has been exhausted, and not even then unless approved by the International Union.

(Stmt of Mat'l Facts, ¶ 5, Exh. 1.) The language contained in Article 24 is also contained in CBAs covering workers at the Bethlehem facility executed in the following years: 1970, 1972, 1975, 1977, 1980, 1983, 1986, 1989, 1992, 1995, 1999, 2003, 2007, and 2010. (Id., ¶ 6.)

On or about May 19, 2016, the parties began negotiating for a successor agreement to the CBA, and on September 7, 2016, Local 6 commenced a strike at the Bethlehem facility. (Id., ¶¶ 7-8.) Plaintiff filed the instant suit on September 26, 2016,

seeking damages and declaratory relief under Section 301 of the Labor Management Relations Act for the Union's alleged breach of the CBA.

IV. **DISCUSSION**

Plaintiff's Complaint seeks damages and injunctive relief for the Union's alleged breach of the CBA. Plaintiff claims that the CBA contained a no-strike clause that prohibited the Union from calling a strike over the terms and conditions of future agreements until after the CBA's expiration, and that despite this clear prohibition, the Union commenced a strike during ongoing negotiations for a new agreement before the expiration of the CBA. In response, the Union claims that the language of the CBA does not preclude strikes over the terms of a new agreement, such as the strike in question.[1] After thorough review of the briefing in this matter and all relevant case law, and after oral argument being held, I find that the September 2016 strike was not in violation of the CBA because Article 24 of the CBA did not prohibit work stoppages over issues, such as negotiation of a successor CBA, that were not subject to the CBA's grievance and arbitration provisions, as is exactly the case here.

The right of private-sector employees to engage in a strike against their employer is generally protected by law. The National Labor Relations Act ("NLRA") guarantees to working men and women the right to engage in such "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157, *see NLRB v. Washington Aluminum Co.*, 370 U.S. 9 (1962). This right, however, may be waived in a

---

[1] The Union also argues that the CBA had expired at the time the strike was commenced, and accordingly, there could be no breach. In response, Plaintiff claims that the CBA was extended by an oral agreement of the parties and was therefore in effect at the time of the strike in question, resulting in an illegal strike by the Union. As the issue of whether an oral extension was entered into is one that cannot be decided on summary judgment, that issue will not be addressed in this opinion. For the purposes of this opinion only, I will assume that the CBA was still in effect at the time of the September 2016 strike.

4

collective bargaining agreement. *See NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 290 (1956); *Delaware Coca-Cola Bottling Co., Inc., v. General Teamster Local Union*, 624 F.2d 1182, 1184 (3d Cir. 1980). The waiver of an employees' statutory right to engage in a strike must be "clear and unmistakable." *Metropolitan Edison Co. v. NLRB*, 663 F.2d 478, 482 (3d Cir. 1981), *aff'd* 460 U.S. 693 (1983). "The extent of the wavier . . . 'turns upon the proper interpretation of the particular contract . . . [which] must be read as a whole and in light of the law relating to it when made.'" *Delaware Coca-Cola*, 624 F.2d at 1184 (*quoting Food Fair Stores, Inc. v. NLRB*, 491 F.2d 388, 395 (3d Cir. 1974). "[A]ny analysis of the waiver issue must begin with an identification of the no-strike obligation in the parties' contract and a determination of its scope." *International Broth. of Elec. Workers, Local 803, AFL-CIO v. NLRB*, 826 F.2d 1283, 1287 (3d Cir. 1987).

CBAs typically contain some such waiver of the right to strike under certain circumstances, and the 2013-2016 CBA between Plaintiff and Defendant was no exception. The relevant question in this matter is whether the CBA between Just Born and Local 6 contained a waiver of the right to strike over the interpretation and application of the agreement itself in exchange for the employer's agreement to resolve any such disputes through a grievance process, or whether the CBA in question waived the right to strike over **any** matter during the term of the CBA. Just Born admits in its Complaint that Article 24 of the CBA "allows strikes only in narrow circumstances where the parties have 'exhausted' the grievance procedure provided in Article 19 of the Agreement," but claims that Article 19 "only provides a procedure for disputes arising from or related to the Agreement itself and terms of employment under and during the

5

pendency of the Agreement, not to grievances over the terms of **future** agreements. . ." *See* Compl, ¶ 10 (emphasis in original). Accordingly, the issue presented here is a narrow one and is limited to a determination of whether the no-strike language contained in Article 24 of the CBA can be construed as waiving the Union's right to strike over nonarbitrable issues such as the terms of a future CBA.

The Third Circuit dealt with similar issues in a series of decisions in the 1980's: *Delaware Coca-Cola Bottling Co. v. General Teamster Local Union 326*, 624 F.2d 1182 (3d Cir. 1980); *Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455 (3d Cir. 1981); and *International Brotherhood of Electrical Workers, Local 803 v. NLRB* ("*IBEW*"), 826 F.2d 1283 (3d Cir. 1987). All three of these cases involved union members who engaged in a strike over issues that were not subject to their CBA's grievance and arbitration provisions despite the fact that their CBA contained a no-strike clause. *Delaware Coca-Cola* and *IBEW* involved sympathy strikes in support of sister unions, and *Pacemaker Yacht* involved a strike over an employee benefit fund's failure to pay employee health insurance premiums.

All three of these cases discussed the doctrine of "coterminous interpretation" when construing the scope of a no-strike clause and its application to nonarbitrable disputes. Under this rule of contract interpretation, "a no-strike clause is presumed to be no broader than the arbitration clause in a collective bargaining agreement." *Pacemaker Yacht*, 663 F.2d at 457, *citing Gateway Coal Co. v. United Mine Workers*, 414 U.S. 368, 382 (1974). "Underlying this presumption is the theory that a no-strike clause is generally a quid pro quo for an arbitration clause." *Id., citing Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 455 (1957). This rule, however, does not preclude a different result if warranted

by the specific language of the CBA, or by extrinsic evidence. *IBEW*, 826 F.2d at 1293-94. Further, *Pacemaker Yacht* specifically rejected the argument that a "general no-strike clause" could **never** be sufficient to waive the right to strike over nonarbitrable issues. 663 F.2d at 459-60. "**Without evidence to the contrary**, it is proper to presume that the no-strike clause is not broader than the arbitration clause." *IBEW*, 826 F.2d at 1294 (emphasis in original) (*quoting Delaware Coca-Cola*, 624 F.2d at 1187).

In summary, "when limited by the principle of coterminous interpretation, a no-strike clause encompasses only arbitrable disputes. Therefore, a claim that the collective bargaining agreement waives the right to strike over a particular nonarbitrable dispute must be established clearly and unmistakably in order to rebut the presumption that the employees' waiver is no greater than the employer's obligation under the arbitration clause." *Pacemaker Yacht*, 663 F.2d at 458. However, the "applicability of the coterminous interpretation doctrine is an independent, preliminary determination" and is "only useful where a no-strike clause is not readily amenable to an alternative construction." *IBEW*, 826 F.2d at 1294-95. Therefore, I must determine if there is specific contractual language in the CBA or extrinsic evidence that would preclude application of the coterminous interpretation doctrine.

### A. Language of the CBA

First, I will examine whether the language of the CBA itself clearly and unmistakably establishes that the waiver of the right to strike extends beyond the scope of the CBA's arbitration clause. As discussed above, Article 24 of the CBA is titled "Prohibition of Strikes and Lockouts," and states that the "Union will not cause . . . nor will any member of the Union take part in, any strike, either sit-down, stay-in or any

other kind of strike, or other interference, or any stoppage, total or partial, of production in the Company's plant until the grievance procedure has been exhausted, and not even then unless approved by the International Union." Clearly, this language shows that the no-strike clause is explicitly tied to the contractual grievance and arbitration procedure. Article 24 explicitly states that strikes are prohibited only "until the grievance procedure has been exhausted." Further, as set forth in Article 19, and as agreed to by the parties, the grievance procedure is not available to resolve disputes over the terms of future collective bargaining agreements, and the Article 24 no-strike provision has no application to nonarbitrable disputes. In other words, as no grievance procedure exists for this type of dispute, Article 24's requirement that the CBA's grievance and arbitration procedures be exhausted prior to any strike has necessarily been satisfied, or is inapplicable.

Just Born argues that the phrase "any strike" in Article 24 results in a broad no-strike clause that waives employees' rights to strike over any issue whatsoever during the term of the CBA, whether arbitrable or not. This type of general waiver of the right to strike is sometimes agreed to by unions as part of a CBA, but such a global waiver must be "clearly and unmistakably" established. *Pacemaker Yacht*, 663 F.2d at 458. The no-strike clause contained in the CBA in *Pacemaker Yacht* was found to contain a global waiver of the right to strike. That no-strike clause read as follows:

> So long as this Agreement is in effect, the Company agrees that there shall be no lockouts and the Union agrees that there will be no strikes, picketing, slow downs, deliberate curtailment of production, work stoppages of any kind or other interruption of the Company's operations.

*Id.* Clearly, this clause is fundamentally different than the no-strike clause at issue in this matter. The *Pacemaker Yacht* clause flatly prohibits any strikes at all during the term of

the CBA, and contains no reference to the contract's grievance and arbitration procedures. That is in stark contrast to the no-strike clause in the instant CBA, which prohibits strikes "until the grievance procedure has been exhausted." It cannot be said that the no-strike clause at issue here "clearly and unmistakably" waives the Union's right to strike during the term of the CBA over anything other than arbitrable issues.

*Pacemaker Yacht* and *IBEW* both found that the unions in those cases had agreed to global no-strike clauses in exchange for the employers' agreement to prohibit lockouts during the term of the CBA. *Pacemaker Yacht*, 663 F.2d at 458-59; *IBEW*, 826 F.2d at 1295. In Article 24 in the instant matter, despite the title being "Prohibition of Strikes and Lock-outs," the language of the clause does not contain a corresponding agreement to refrain from locking employees out. There clearly is no quid pro quo here between the waiver of the right to strike and the agreement not to lock employees out.

Just Born argues that Article 24 is not quid pro quo for the arbitration provision and therefore, the coterminous interpretation doctrine does not apply. In making this argument, Just Born relies on the fact that the CBA contains two no-strike provisions, Article 24 and Article 19.1, arguing that because there are two separate provisions, Article 24 must be read as being broader than Article 19.1. Article 19.1 is the initial paragraph of the grievance and arbitration provisions, and states that differences in the meaning and application of the CBA will be settled through grievance procedures and not through work stoppages. (Stmt of Mat'l Facts, Ex. 1 at 23.) Just Born argues that Article 19.1 was the quid pro quo for the arbitration procedure and that, "[i]f the Article 24 no strike clause did not reach a broader universe of labor stoppages than those that were subject to arbitration, as the Union claims, it would improperly be rendered surplusage."

Just Born cites to *Pacemaker Yacht* in support of this argument, as that Court found that the coterminous interpretation doctrine did not apply due to the existence of two no-strike provisions in the CBA. However, a thorough review of the two no-strike provisions in *Pacemaker Yacht* shows that this argument must fail. It is true that Article 19.1 in the instant CBA is very similar to the language of Article 9.1 in the *Pacemaker* CBA. However, Article 10.1 in *Pacemaker* is drastically different from Article 24 in the instant agreement. Article 10.1 in *Pacemaker* stated:

> So long as this Agreement is in effect, the Company agrees that there shall be no lockouts and the Union agrees that there will be no strikes, picketing, slow downs, deliberate curtailment of production, work stoppages of any kind or other interruption of the Company's operations.

663 F.2d at 458. As discussed, Article 24 in the CBA at issue stated:

> The Union will not cause of permit its members to cause, nor will any member of the Union take part in, any strike, either sit-down, stay-on or any other kind of strike, or other interference, or any stoppage, total or partial, of production in the Company's plant until the grievance procedure has been exhausted, and not even then unless approved by the International Union."

(Stmt of Mat'l Facts). The Third Circuit in *Pacemaker* found that "the parties intended Article IX to bar strikes over arbitrable disputes and Article X to bar strikes over all other disputes." *Id.* at 459. However, the same conclusion cannot be made in the instant matter, as Article 24 does not contain the language of *Pacemaker* Article 10 that states "[s]o long as this Agreement is in effect…" and rather refers to a prohibition of strikes "until the grievance process has been exhausted." Article 24 is too dissimilar to the *Pacemaker* Article 10 to be construed to bar strikes over all other disputes, as was the case in *Pacemaker Yacht.* For whatever reason, Article 24 in this case refers to and/or amplifies Article 19.1 of the CBA. Therefore, it cannot be held that the contractual language at

10

issue includes "two no-strike clauses, one expressly tied to the arbitration clause and one prohibiting all strikes," as was the case in *Pacemaker*. *Id.* at 459.

I find Plaintiff's argument that Article 24 is merely "surplusage" if it does not extend to include strikes over nonarbitrable issues to be non-persuasive. Article 24 prohibits all strikes that are not approved by the International Union. Article 19 does not contain any such prohibition. Clearly, if Article 24 contains an obligation not contained in Article 19, it cannot be said that Article 24 is mere surplusage.

**B. Extrinsic Evidence**

Next, I will consider all of the extrinsic evidence produced by the parties. Plaintiff has produced versions of the CBA dating back to 1947. In those versions, the no-strike clause remained substantially the same from 1947 through the 1968-1970 agreement. The provision in the 1968-1970 agreement stated:

> Article XXIV. PROHIBITION OF STRIKES AND LOCK-OUTS
>
> There shall be no strike, lock-out, slow-down, interruption of work, boycott, secondary boycott, or temporary walkout during the term of this agreement, but it is understood that this paragraph of this agreement shall not obligate any employee to cross a legitimate picket line, provided the Central Labor Union of the County of Northampton hold that said picket line is legitimate.

(ECF No. 31-2, Arnold Decl., Exh. B). In the 1970 CBA, Article 24 was rewritten into the following form:

> Article XXIV. PROHIBITION OF STRIKES AND LOCK-OUTS
>
> The Union will not cause or permit its members to cause, nor will any member of the Union take part in any strike, either sit-down, stay-in or any other kind of strike or other interference or any stoppage, total or partial, of production in the Company's plant until the grievance procedure has been exhausted, and not even then unless approved by the International Union.

11

(ECF No. 31-3, Arnold Decl. Exh. C.)

A review of these two versions of Article 24 shows that in 1970, the parties significantly narrowed the no-strike clause. The previous clause stated that "[t]here shall be no strike . . . during the term of this agreement" except for union-sanctioned sympathy strikes. The 1970 agreement removed the language "no strike . . . during the term of this agreement" and replaced it with language prohibiting "any strike" . . . "until the grievance procedure has been exhausted," and removed the language from the agreement (although not from the caption) on the prohibition of employer lockouts. Both of these changes significantly narrowed the scope of the no-strike provision. The provision did expand slightly in 1970 by adding a new prohibition on non-approved strikes, but it is clear that the 1970 changes narrowed the scope of the no-strike clause as a whole. This narrowing is further evidence that the no-strike clause at issue was not meant to prohibit all strikes, as would have been the case during the term of the 1947 to 1968 agreements.

In further support of its argument that Article 24 is not quid pro quo for the arbitration and grievance procedure, and that the coterminous interpretation doctrine should not apply, Just Born relies on the history and state of the law, as well as the course of conduct between the parties. However, both of these arguments are non-persuasive, and I find that Article 24 is in fact quid pro quo for the grievance provision in the CBA. As in many such cases, this union would still retain the right to strike over terms of future collective bargaining agreements.

Just Born argues that the history and state of the law at the time Article 24 was enacted "demonstrate a mutual understanding that a strike conducted over new economic terms and conditions was prohibited during the term of the Agreement." (Pl's Brief, pp.

8-12.) In support of this argument, Just Born cites to *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270 (1956), which interpreted no-strike language also prohibiting "any strike or work stoppage during the term of this agreement" as not reaching strikes over alleged unfair labor practices, and an NLR B decision, *Mid-West Metallic Products*, 121 NLRB 1317, 1319-20 (1958), which distinguished *Mastro Plastics* where a no-strike clause provided that no strike would occur "until all steps in the grievance procedure set forth have been observed." *Id.* at 1353. Plaintiff claims that as a result of these two decision in the late 1950's, and after two unfair labor practices strikes at the Bethlehem facility in 1967 and 1970, the 1970 CBA was changed to the current version of the Article 24 no-strike clause. Thereafter, upon expiration of the 1970 CBA, an economic strike was called by the Union. Just Born argues that this historical evidence and the state of the law when Article 24's current version was first adopted shows that its purpose was to ensure that the no-strike clause reached "both the economic strikes that had always been barred, per the *Mastro Plastics* holding that a clause reaching "any strike" covers an economic strike, as well as the type of unfair labor practices strikes staged in 1967 and 1970, through the language 'until the grievance procedure has been exhausted' as approved in *Mid-West Metallic Products*." (Pl's Br., p. 11.)

In response, the Union argues that the 1970 changes in Article 24 were most likely prompted by the 1967 and 1970 unauthorized "wildcat" strikes, and that the requirement that the International Union approve any strike was introduced to address such unauthorized strikes. (Def's Reply Br., p. 12.) The Union also points out that the *Mastro Plastics* decision and *Mid-West Metallic Products* decisions were entered over a decade before the current version of Article 24 was drafted, and that the CBA was

13

renegotiated six times between those decisions and the 1970 change to Article 24 with no resultant change in the no-strike clause. Accordingly, it would be very hard to argue that these decisions had any effect on the 1970 change to Article 24.

Just Born and the Union both enter into speculation as to the impetus for the 1970 change to Article 24 no-strike clause, and mere speculation is exactly what it is. Absent any actual evidence as to the driving force behind this change, I find Plaintiff's speculation is insufficient to form a basis in fact that the parties had a "mutual understanding that a strike conducted over new economic terms and conditions was prohibited during the term of the Agreement," as argued by Just Born.

Lastly, Plaintiff argues that the parties' conduct during the 2016 labor negotiations demonstrated a "shared understanding that the Article 24 no-strike clause barred economic strikes during the term of the Agreement." (Pl's Br., p. 12.) Just Born cites to deposition testimony from many union members that it claims shows that the Union believed that it could not strike during the term of the Agreement. However, I find this testimony of Union members relied on by Just Born to be unpersuasive to show that the Union and Just Born had a shared understanding that the Article 24 barred economic strikes during the term of the Agreement. There is no evidence that any of these statements were ever made to Just Born in connection with the strike, and some of the statements seem to reflect witnesses' personal understanding of the provision, resulting in personal opinions about what Article 24 means. This is not persuasive to show a shared understanding about Article 24's meaning.

The language of the CBA between Just Born and the Union clearly limits the Union's waiver of the right to strike to issues that can be resolved through the CBA's

grievance and arbitration provisions, which do not include disputes over the terms of a future CBA. There is no evidence in this matter from which I can conclude that the Union "clearly and unmistakably" waived its right to strike over nonarbitrable issues. I find that the coterminous interpretation doctrine is applicable in this case, and must be applied to limit the scope of the Union's no-strike obligation only to arbitrable disputes. Therefore, the Union's September 2016 strike was not a violation of the CBA, and summary judgment is favor of the Union is warranted.

## V.     CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is granted, Plaintiff's Cross-Motion for Summary Judgment is denied, and this case is dismissed. An appropriate order follows.